BRYAN, Judge.
Three of the defendants in this action, AmSouth Bank, N.A. (“AmSouth”), Sea Shell, Inc. (“Sea Shell”), and Island House, Inc. (“Island House”), appeal a judgment (1) declaring that the restrictive covenants limiting the use of nine contiguous beachfront lots (“the nine lots”) in Orange Beach to single-family dwellings are unenforceable and (2) denying AmSouth, Sea Shell, and Island House’s counterclaim seeking compensation for the loss of those restrictive covenants. We affirm.
Because the action was tried before the trial judge without a jury and the trial judge heard evidence ore tenus, “we must view ‘ “the evidence in the light most fa *548 vorable to the prevailing parities].” ’ ” Diggs v. Diggs, 910 So.2d 1274, 1275 (Ala.Civ.App.2005) (quoting Architectura, Inc. v. Miller 769 So.2d 380, 332 (Ala.Civ.App.2000), quoting in turn Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992)). Viewed in that manner, the evidence established the following facts.
The nine lots are located within an area designated as the Alabama Point/Perdido Key neighborhood by the City of Orange Beach’s Planning Commission (“the planning commission”). The planning commission defines the Alabama Point/Perdido Key neighborhood as the area “located along Alabama Highway 182, east of [its] intersection with Highway 161, south of Cotton Bayou and north of the Gulf [of Mexico] to the eastern corporate limits [of the City of Orange Beach].” The southern boundaries of the nine lots abut the Gulf of Mexico, and their northern boundaries abut Alabama Highway 182 (“Highway 182”). The distance between the southern and northern boundaries of the nine lots vary, but that distance averages approximately 500 feet. The western boundary of the westernmost lot abuts a parcel of land on which one of the plaintiffs, British West Florida, L.L.C. (“BWF”), is presently building the Turquoise Place Condominiums. The eastern boundary of the easternmost lot abuts a parcel of land on which the Island House Hotel has been located since approximately 1992. The distance from the western boundary of the westernmost lot to the eastern boundary of the easternmost lot is approximately 922 feet. The nine lots are approximately one mile east of the intersection of Highway 182 with Highway 161 and approximately one mile west of Alabama Point.
The present owners of the nine lots (“the landowners”) are plaintiffs; the landowners are: Robert W. Shallow; Susan M. Shallow; William G. Buchanan; Helen H. Buchanan; William G. Buchanan, Jr.; Bradley H. Buchanan; Dickson W. Buchanan; Ann Buchanan McRae; Elizabeth G. Blanton; the estate of Nell M. Moss; Dexter M. Buccilli; Patricia M. Vlack; Janet M. Caíame; Walter R. Neill, Jr.; Elizabeth Wadsworth Neill; Karlene Neill Raper; Kilpatrick Investments, L.L.C.; Patricia Hall Linton; Jean Hall Sulzby; Wendy Hall Jacoway; John P. Hornung, Sr.; Ann B. Hornung; David P.K. Bruck-mann; James W.B. Bruckmann; and Peter E.G. Bruckmann.
In 1945, Jesse A. Martin (“Jesse”) acquired title to (1) the land that now constitutes the nine lots, (2) the parcel of land on which the Island House Hotel is now located, and (3) some parcels of land located north of Highway 182. Between 1955 and 1967, Jesse and her husband, Carl T. Martin (“Carl”), executed deeds conveying to various grantees the parcels of land that now constitute the nine lots. Each of the deeds contained restrictive covenants restricting the use of that land to single-family dwellings.
When Jesse and Carl executed the deeds containing the restrictive covenants, the City of Orange Beach had not yet been incorporated. At that time, no hotels or condominiums existed within what is now the City of Orange Beach. Indeed, other than a single bait shop located near Alabama Point, there was nothing in the area except vacant land and single-family dwellings. Little change occurred in the area before Hurricane Frederick struck the area in 1979.
Since 1979, the area within a one-mile radius of the nine lots has become a major resort and tourist attraction, and over 2,000 hotel and condominium units have been constructed south of Highway 182 within a one-mile radius of the nine lots. Completion of the construction of the two *549 multistory towers of the Turquoise Place Condominiums immediately west of the nine lots will add another 400 condominium units. The beachfront within a one-mile radius of the nine lots is now dominated by multistory condominiums and hotels. Highway 182 is now a heavily traveled, five-lane highway that constitutes the only east-west traffic artery serving the resort area of Orange Beach and the 2,000 hotel and condominium units on the beach near the nine lots. The commercial establishments that have been built along Highway 182 within a one-mile radius of the nine lots since 1979 include restaurants, souvenir shops, clothing stores, real-estate offices, a drugstore, a bookstore, marinas, and service stations.
The City of Orange Beach incorporated as a municipality in 1984. In 1999, its city council adopted a comprehensive land-use plan. In pertinent part, that plan states that the Alabama Point/Perdido Key neighborhood “is intended to continue developing much in the same manner as it has prior to the Plan. Hotel and condominium type development is prevalent on the south side of Highway 182 with local shops and residential developments on the north.”
The nine lots have been used for single-family dwellings since Jesse and Carl created the restrictive covenants. However, there are now very few other single-family dwellings on the beachfront in the Alabama Point/Perdido Key neighborhood. Two of the landowners testified at trial that the influx of people and traffic since 1979 has adversely affected their ability to enjoy their property. Strangers now frequently trespass on their property, and the landowners must deal with the increased traffic on Highway 182 resulting from the construction of the 2,000 hotel and condominium units nearby. A third landowner testified by deposition that the construction of condominiums on the beachfront and the influx of large numbers of people had drastically changed the beachfront in the area, although he admitted that the changes had not made it physically impossible to use the nine lots for single-family dwellings.
A church and a gas station are located directly across Highway 182 from the nine lots on land that Jesse and Carl once owned. The Chicago Gulf Beach Subdivision (“the subdivision”), which is devoted to single-family dwellings, is located north of the church and the gas station, and Cotton Bayou is located north of the subdivision. At one time, Jesse and Carl owned all of the land on which the subdivision is located; however, they sold some of that land before their deaths. AmSouth Bank, in its capacities as the successor trustee for Carl’s estate and as the successor executor de bonis non under Jesse’s will, now owns the parcels of land in the subdivision that Jesse and Carl still owned at their deaths. A commercial marina, a boat-storage facility, and a small shopping center are located directly across Highway 182 from the Island House Hotel on land that Jesse and Carl owned at one time. Undeveloped land is located directly across Highway 182 from the parcel of land on which the Turquoise Place Condominiums is being built.
The parcel of land on which the Island House Hotel is located is now owned by the City of Orange Beach and is under a long-term lease to Island House; it is not subject to restrictive covenants. Sea Shell, which owns 50% of the stock of Island House, is the grantee named in two instruments purporting to convey the interest of Jesse and Carl’s estates in the restrictive covenants encumbering the two easternmost lots of the nine lots.
The landowners attempted unsuccessfully to prevent the 11-story Island House *550 Hotel from being built on the parcel of land contiguous to the easternmost lot of the nine lots and to prevent the high-rise, 400-unit Turquoise Place Condominiums from being built on the parcel of land contiguous to the westernmost lot of the nine lots. After those efforts failed, the landowners entered into contracts with BWF in which they agreed to sell the nine lots to BWF. BWF’s obligation to buy the nine lots is contingent on an adjudication that the restrictive covenants are unenforceable. BWF plans to build two multistory condominium towers, which will be named Turquoise Place East Condominiums, on the nine lots if the restrictive covenants are adjudicated to be unenforceable.
In August 2004, the landowners and BWF sued all parties claiming an ownership or possessory interest in the land that Jesse and Carl owned when they placed the restrictive covenants on the nine lots, seeking a judgment declaring the restrictive covenants unenforceable. AmSouth, Sea Shell, and Island House were the only defendants who contested the propriety of the relief sought by the landowners and BWF. Those three defendants also asserted a counterclaim in which they alleged a claim, based on principles of equity, seeking compensation for the loss of the restrictive covenants if the trial court declared them unenforceable.
Following entry of the judgment declaring the restrictive covenants unenforceable and denying the counterclaim of AmSouth, Sea Shell, and Island House (hereinafter collectively referred to as “the defendants”), the defendants timely appealed to the supreme court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
The trial judge concluded that the restrictive covenants should be declared unenforceable on the basis of two independent, alternative tests — the change-in-the-neighborhood test and the relative-hardship test. See Lange v. Scofield, 567 So.2d 1299, 1301-02 (Ala.1990). The defendants argue on appeal that the evidence did not establish the requirements of either of those tests. Because the trial judge heard ore tenus testimony, our review of the judgment is governed by the following principles:
“ ‘[Wjhen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.’ Philpat v. State, 848 So.2d 122, 125 (Ala.2002). ‘ “The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Wattman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). ‘Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Id.”
Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005).
Under the change-in-the-neighborhood test, a restrictive covenant will not be enforced if the character of the neighborhood has changed so radically that the original purpose of the covenant can no longer be accomplished. See Lange v. Scofield, 567 So.2d at 1301. In the case now before us, the judgment stated:
“To assess whether changes in the neighborhood here warrant setting aside the restrictive covenants, the Court must first define the neighborhood. The Defendants offered no clear alternative to the definition of the neighborhood found in the Orange Beach Comprehen *551 sive Land Use Plan, and the Court defines the neighborhood to be that area ‘located along Alabama Highway 182, east of [its] intersection with Highway 161, south of Cotton Bayou and north of the Gulf to the eastern corporate limits.’ The Court has focused, however, on a smaller area more immediate to the [nine lots], which is bounded on the west by Highway 161 and the east by Alabama Point and which is approximately two miles in length.
“The Court finds based on the evidence presented at trial that the changes in the neighborhood occurring since the covenants were imposed in the 1950’s and 1960⅛ defeat the original purpose of the covenants. The Court finds that the property is no longer suitable for single-family residential use and that the restrictive covenants are due to be set aside.
“The Defendants contend that the extensive changes in the neighborhood are insufficient to justify setting aside the restrictions because there have been no violations of the restrictions within the nine lots, relying primarily on Centers, Inc. v. Gilliland, 285 Ala. 593, 234 So.2d 883 (1970). But the Centers court did not find that changes in a surrounding neighborhood could never defeat the purpose of restrictive covenants or that changes inside the restricted area were required to set aside such covenants. See id. at 595, 234 So.2d at 886. Furthermore, the subdivision in Centers contained 46 lots. See 285 Ala. at 594, 234 So.2d at 884. Here, there are only nine lots, and all of them front Highway 182. There is no subdivision entrance, and there are no border lots. There is no buffer whatsoever between the lots and a busy five-lane highway and surrounding commercial use. With only nine lots, the impacts from the drastic changes in the surrounding neighborhood are more strongly felt.”
The defendants first argue that the trial judge erred in concluding that the evidence met the requirements of the change-in-the-neighborhood test because, they say, the evidence indicated that there has been very little change in the neighborhood. In support of that argument, the defendants point out that the Island House Hotel immediately east of the nine lots; the commercial marina, boat-storage facility, and small shopping center directly across Highway 182 from the Island House Hotel; and the church and gas station directly across Highway 182 from the nine lots have all been in their present locations since 1992 and that the subdivision has been in its location north of the church and the gas station “for decades.” However, this argument ignores the fact that the Island House Hotel, the commercial marina, the boat-storage facility, the small shopping center, the church, and the gas station themselves constitute a change in the neighborhood that has occurred since the restrictive covenants were created in the 1950s and the 1960s — the parcels of land now occupied by the Island House Hotel, the commercial marina, the boat-storage facility, the small shopping center, the church, and the gas station were either vacant or devoted to single-family dwellings when the restrictive covenants were created. The change in the character of the neighborhood must be determined based on a comparison of its present character with its character when the restrictive covenants were created in the 1950s and the 1960s rather than its character in 1992. See Johnson v. H.J. Realty, 698 So.2d 781, 784 (Ala.Civ.App.1997) (“[W]e conclude that the trial court did not err in finding that fundamental and substantial changes had occurred since the restrictive covenants were originally imposed on the property.” (emphasis added)).
*552 Moreover, the defendants’ argument ignores the drastic changes in the use of the other land located within a one-mile radius of the nine lots, such as the construction of over 2,000 hotel and condominium units on the beachfront and the establishment of numerous commercial establishments along Highway 182. In Johnson v. H.J. Realty, this court affirmed a trial court’s judgment declaring restrictive covenants unenforceable under the change-in-the-neighborhood test when the trial court considered changes within a one-mile radius of the property that was subject to the restrictive covenants. 698 So.2d at 784. Accordingly, we find no merit in the defendants’ first argument.
The defendants also argue that the trial judge erred in concluding that the evidence satisfied the change-in-the-neighborhood test because, they say, there has been no change in the use of the nine lots themselves since the restricted covenants were created. However, the defendants have not cited any legal authority holding that a change in the use of the property subject to the restrictive covenants must have occurred in order to satisfy the requirements of the change-in-the-neighborhood test. In Johnson v. H.J. Realty, this court affirmed a judgment declaring restrictive covenants unenforceable under the change-in-the-neighborhood test in the absence of any change in the use of the property subject to the restrictive covenants. Moreover, to hold that such a change is necessary in order to satisfy the change-in-the-neighborhood test would give the owners of land subject to restrictive covenants an incentive to violate the restrictive covenants. Accordingly, we find no merit in the defendants’ second argument.
The defendants also argue that, although the zoning of the nine lots has been changed contingent on the restrictive covenants being declared unenforceable, that contingent change in zoning does not constitute evidence of a change in the neighborhood. We agree; however, the trial judge did not treat the contingent change in the zoning of the nine lots as evidence of a change in the neighborhood — he treated it merely as evidence indicating the zoning authority’s opinion regarding the best use of the nine lots. The judgment stated:
“While the zoning of property is not of itself determinative of a change in the character of the neighborhood, it is indicative of the zoning authority’s opinion of the best use of the property and is a factor that courts examine when considering whether changes in the neighborhood warrant setting aside restrictive covenants. See 20 AmJur 2d Covenants, Conditions, and Restrictions § 242 and the cases cited therein; Johnson [v. H.J. Realty ], 698 So.2d [781] at 784 [(Ala.Civ.App.1997)] (noting that the property subject to the challenged restrictions had already been zoned for commercial use).”
(Emphasis added.) Moreover, the trial judge had before him an abundance of other evidence establishing that drastic changes in the neighborhood had occurred since the creation of the restrictive covenants, such as the evidence establishing that, since the creation of the restrictive covenants in the 1950s and the 1960s, (1) a neighborhood that consisted of vacant land, single-family dwellings, and one bait shop is now dominated by high-rise hotels and condominiums with over 2,000 units; (2) an 11-story hotel has been constructed on the parcel of land contiguous to the easternmost lot of the nine lots; (3) a 400-unit high-rise condominium is presently being built on the parcel of land contiguous to the westernmost lot of the nine lots; (4) the neighborhood has become a popular resort and tourist attraction; and (5) *553 Highway 182 has become a heavily traveled, five-lane thoroughfare. Therefore, we find no merit in the defendants’ third argument.
As their fourth argument challenging the trial judge’s conclusion that the evidence satisfied the change-in-the-neighborhood test, the defendants argue that the trial judge erred in finding that the nine lots had become unsuitable for single-family dwellings. We agree that, although the evidence establishes that the nine lots are not an ideal location for single-family dwellings, it does not establish that they are an unsuitable location for single-family dwellings. However, as we will explain, a finding that the nine lots are unsuitable for single-family dwellings is not an indispensable condition of a determination that the changes in the neighborhood have defeated the original purpose of the restrictive covenants. The uncontradicted evidence establishes that, when Jesse and Carl created the restrictive covenants in the 1950s and the 1960s, all of the land in the neighborhood, aside from a single bait shop located approximately a mile away from the nine lots, was either vacant land or devoted to single-family dwellings. The restrictive covenants benefited the land that Jesse and Carl had retained when they sold the nine lots by preventing the introduction of commercial establishments, hotels, and condominiums into proximity with the land they had retained. However, beginning 12 years after Jesse and Carl created the last of these restrictive covenants, the use of their remaining land and the use of the land in the rest of the neighborhood began to change drastically. Jesse and Carl did not place restrictive covenants on the parcel of land immediately north of the nine lots, and a gas station and a church were built there in approximately 1992. Jesse and Carl did not place restrictive covenants on the parcels of land located immediately north of the Island House Hotel, and a commercial marina, a boat-storage facility, and a small shopping center were built there in approximately 1992. Likewise, restrictive covenants do not encumber the parcel of land that Jesse and Carl owned immediately east of the nine lots, and the 11-story Island House Hotel was built there in approximately 1992. The beachfront within a one-mile radius of the nine lots is now dominated by multistory condominiums and hotels containing over 2,000 units. Two multistory condominium towers containing 400 units are being built immediately west of the nine lots. Numerous commercial establishments have been built along Highway 182. The neighborhood has become a major resort and tourist attraction, and Highway 182 has become a busy five-lane thoroughfare. Because of the drastic changes in the neighborhood that have occurred since the restrictive covenants were created, restricting the use of the nine lots to single-family dwellings cannot prevent the introduction of commercial establishments, hotels, and condominiums into proximity with the land that Jesse and Carl had retained when they sold the nine lots. Accordingly, although we disagree with the trial judge’s finding that the nine lots have become unsuitable for single-family dwellings, we nonetheless agree with his conclusion that the evidence satisfied the change-in-the-neighborhood test. “We will affirm a trial court if it is right for any reason supported by the record.” Taylor v. Stevenson, 820 So.2d 810, 814 (Ala.2001).
The defendants also argue that “[t]o the extent that the trial court based its judgment on the difference in value of the [nine] lots as restricted and without the restrictions, the [trial] court’s ruling is contrary to law.” (Appellants’ brief at p. 38.) The trial judge’s explanation of his rationale for concluding that the evidence satisfied the change-in-the-neighborhood test *554 indicates that he did not base that conclusion on the evidence indicating that the nine lots would be more valuable without the restrictive covenants. Moreover, we have demonstrated above that the record establishes a valid basis for affirming the trial judge’s conclusion that the evidence satisfied the change-in-the-neighborhood test.
The defendants also argue that the trial judge erred in concluding that the evidence satisfied the change-in-the-neighborhood test because, they say, the original purpose of the restrictive covenants has not been defeated. We disagree for the reasons explained above.
As their final argument challenging the trial judge’s conclusion that the evidence satisfied the change-in-the-neighborhood test, the defendants argue that declaring the restrictive covenants unenforceable is inequitable. We disagree. The evidence established that the landowners were not responsible for the changes in the neighborhood that had defeated the original purpose of the restrictive covenants. Indeed, the landowners had attempted unsuccessfully to prevent two of the changes, i.e., the construction of the Island House Hotel immediately east of the nine lots and the construction of the Turquoise Place Condominiums immediately west of the nine lots. On the other hand, AmSouth’s predecessors in title, Jesse and Carl, failed to place restrictive covenants on the land immediately east, north, and northeast of the nine lots when they sold that land and, therefore, share some of the responsibility for some of the changes in the neighborhood that have defeated the original purpose of the restrictive covenants, such as the use of the land immediately east of the nine lots for the 11-story Island House Hotel; the use of the land immediately north of the nine lots for a gas station; and the use of the land immediately northeast of the nine lots for a commercial marina, boat-storage facility, and small shopping center. Similarly, Island House, as the owner and operator of the Island House Hotel, and Sea Shell, as a 50% owner of Island House, share responsibility with AmSouth’s predecessors in title for the use of the land immediately east of the nine lots for the Island House Hotel. Accordingly, we do not find the trial judge’s declaration that the restrictive covenants are unenforceable under the change-in-the-neighborhood test to be inequitable.
We conclude that the trial judge did not err in concluding that the evidence satisfied the change-in-the-neighborhood test. Because the change-in-the-neighborhood test and the relative-hardship test are independent, alternative grounds for declaring restrictive covenants unenforceable, our conclusion that the trial judge did not err in declaring the restrictive covenants unenforceable under the change-in-the-neighborhood test renders moot the issue whether the trial judge erred in reaching his alternative conclusion that the evidence satisfied the relative-hardship test. Therefore, we pretermit discussion of that issue.
The defendants next argue that the trial judge erred in denying their counterclaim seeking compensation for the loss of the restrictive covenants, a counterclaim that the defendants based entirely on equitable principles. However, as we demonstrated above, the equities in this case entirely support the landowners rather than the defendants. Therefore, we find no error in the trial judge’s denial of the defendants’ counterclaim seeking compensation based on equitable principles.
AFFIRMED.
*555 THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.